MELVIN A. YARLOTT, JR., AND REBECCA L. YARLOTT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4802–78.    Filed April 12, 1982.

---

[4]Common law dower has been abolished in North Carolina. N.C. Gen. Stat. sec. 29–4 (Michie 1976).

*Ronald Patrick Smith, Jack D. Gage,* and *John S. Jagiela,* for the petitioners.
*Dale L. Newland,* for the respondent.

STERRETT, *Judge*: By statutory notice dated March 6, 1978, respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1974 and 1975 in the amounts of $4,189.47 and $4,839.76, respectively. The sole issue for decision is whether certain payments received by petitioner Melvin A. Yarlott, Jr., during the years in issue qualify for exclusion from gross income pursuant to section 117, I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Melvin A. Yarlott, Jr., and his wife, Rebecca L. Yarlott, resided in Minneapolis, Minn., at the time of filing the petition herein. Rebecca L. Yarlott is a party to this proceeding solely by reason of her filing a joint income tax return with Melvin A. Yarlott, Jr. (hereinafter petitioner). They timely filed joint Federal income tax returns for the taxable years 1974 and 1975 with the Office of the Director, Internal Revenue Service.

Between September 1966 and May 1970, petitioner was a medical student at the University of Colorado Medical School. After graduating from that institution in 1970, he commenced a 1-year internship at Mary Imogene Bassett Hospital, Cooperstown, N.Y., that lasted from June 1970 until June 1971.

In July of 1971, petitioner enrolled as a student in the

University of Minnesota Graduate School Surgery Program in the health sciences (hereinafter Surgery Program).[1] He completed the program in June of 1978.

The University of Minnesota is an educational institution described in section 170(b)(1)(A)(ii). It operates on an academic-year basis for purposes of scheduling courses and paying stipends. Such year commences on July 1 of each year and ends on June 30 of the following year.

The Surgery Program is a 7-year program, the completion of which fulfills the requirements for a Ph. D. degree in surgery. The Surgery Program and other advanced medical degree programs (hereinafter sometimes collectively referred to as medical fellowship programs, with the participants therein referred to as medical fellows) of the University of Minnesota contain a traditional residency program wherein physicians obtain the training and experience necessary to become certified in a medical specialty. However, unlike the typical residency program, which does not lead to an advanced degree, the medical fellowship programs at the University of Minnesota also require the completion of an academically oriented program (hereinafter the academic phase) which combines formal course work with research, writing, and thesis requirements. The academic phase of the Surgery Program is required of all candidates for advanced degrees in surgery but is not required of Minnesota surgery residents in general.

The Surgery Program is divided into three segments. During the first 2 years, the degree candidate is engaged in the clinical phase of the program. The academic phase, which is uninterrupted, usually begins in the third year of the program and continues through the fourth year and sometimes into or through the fifth year of the program. The remaining years are devoted to the completion of the clinical phase.[2]

During his first 2 years in the Surgery Program, which

---

[1] The parties have stipulated that petitioner was a "candidate for a degree" within the meaning of sec. 117(b)(1) at all times during 1974 and 1975, the years in issue.

[2] Dr. John S. Najarian, chairman of the department of surgery of the University of Minnesota Hospitals, testified that the research phase of the program was situated between the two clinical segments in order to eliminate the temptation of students to abandon the research phase and go directly into private practice, or to abandon the traditional residency portion and go into research unrelated to surgery.

covered the period from July 1, 1971, to June 30, 1973, petitioner devoted most of his time to required clinical courses involving the management of surgical patients. He also attended a weekly review of topical roentgen findings that had arisen from the treatment of surgical patients. The clinical courses were offered by the University of Minnesota Graduate School with course assignments at the University of Minnesota Medical School, the University of Minnesota Hospitals (hereinafter University Hospital), St. Paul-Ramsey Hospital, and the Veterans' Administration Hospital (hereinafter all collectively referred to as the affiliated hospitals).

During petitioner's third, fourth, and fifth years of the Surgery Program, which covered the period from July 1, 1973, to June 30, 1976, and included the 2 years in issue in this case, petitioner was engaged in the academic phase of the program. During this time, petitioner spent at least the majority of his time performing research in the area of tumor immunology and completing the formal classroom courses necessary to satisfy the minor or supporting work prerequisite for the Ph. D. degree. In his final 2 years of the Surgery Program, which began on July 1, 1976, and ended on June 30, 1978, petitioner devoted substantially all of his time to activities connected with the remaining clinical courses required to be completed by all candidates for the Ph. D. degree.

### Clinical Phase

During the first and second years of his medical fellowship, petitioner was credited as being the surgeon in 125 major operations and 56 minor operations.[3] He also assisted in 308 major operations and 8 minor operations during that time. During 1972, petitioner also enrolled in several courses that were offered at various hospitals affiliated with the University of Minnesota Graduate School.[4] Petitioner was expected to complete his course assignments, which included rounds and

---

[3] As the medical fellows progress through the Surgery Program, they assume increased responsibilities on the wards and in the operating room. They occasionally operate without staff supervision.

[4] Graduate School medical fellows enroll for academic credit in University of Minnesota courses which are offered at the affiliated hospitals within the Twin Cities area. The department of surgery currently is affiliated with, and was during the years at issue, the

other assigned activities, even when an emergency or an occasional lecture interrupted their routine. Altogether, petitioner estimated that he spent 280 to 360 hours per month at the assigned hospitals during 1972.

As part of his clinical activities in the sixth and seventh years of the Surgery Program, years other than those in issue, petitioner was required to be on call from 2 to 5 nights during the week and on weekends. The frequency of his on-call duties varied according to the hospital to which he was assigned and to the number of medical fellows assigned to his service. During these 2 years, petitioner spent an average of 8 to 12 hours a day at his assigned hospital. His day typically would begin at 6 or 6:30 a.m. He first would review the charts of all patients and then examine the patients in intensive care. Following rounds in intensive care, he would go to the operating room and begin operating. Thereafter, he would make patient rounds.

During the final year of the program, medical fellows are required to act as chief residents at either the University Hospital or at one of the affiliated hospitals. In this position, they are on call 24 hours a day and are required to assume extensive supervisory and administrative responsibilities, including running their own services, organizing and teaching medical students and interns, and scheduling and supervising the other residents and medical fellows. Petitioner performed 214 major operations and 92 minor operations and assisted in 11 major operations during his final year in the program.

In addition to the above, petitioner engaged in numerous other treatment activities while participating in the clinical portion of the program. These included, among others, ordering prescriptions; writing treatment orders for patient care; taking patients' physical and medical histories; ordering X-rays, laboratory tests, and consultations; assessing and diagnosing patients; reviewing internal and medical student diagnoses; securing autopsy consents; preparing progress notes, case summaries, and discharge notes; commencing the administration of intravenous fluids; inserting nasal gastric

---

hospitals hereinbefore named. Some of the staff physicians at the affiliated hospitals are accorded faculty status at the University of Minnesota.

tubes; preparing patients for operations; completing operative notes; changing dressings; removing sutures; and working in the emergency room.

## Academic Phase

The academic phase of the Surgery Program affords qualified medical students an opportunity to participate in an academic surgery course of study in addition to the traditional residency training necessary to become board certified in the medical specialty of general surgery.[5] It also furthers one of the principal missions of the University of Minnesota—the performance of research.

As stated, a resident physician must complete both the clinical and academic phases of the Surgery Program in order to receive the Ph. D. In the usual case, both phases are completed at the University of Minnesota.[6]

To fulfill the requirements of the academic phase, a candidate for a degree in the Surgery Program must spend approximately 2 to 3 years in the laboratory doing research, performing experiments, and compiling data. The student is required to undertake original investigative research with respect to problems in either experimental or clinical surgery and is required to prepare a thesis which shows originality, demonstrates the power of independent investigation, and constitutes a significant contribution to the progress of science.[7] In addition, candidates must complete from 18 to 24 quarter credits in a nonclinical field to be offered as the minor or supporting program for the Ph. D. degree.

Petitioner's research project during the years in issue involved experiments in tumor immunology. Petitioner chose his own project, and in so doing was not confined to a prescribed list of approved projects. The project selected by

---

[5]The academic phase is not a prerequisite to board certification.

[6]There was some evidence, however, that in exceptional cases, qualified students were allowed to receive either their clinical or academic training at a school other than the University of Minnesota.

[7]The University of Minnesota retains a right to share in any royalties produced from patentable research performed by a medical fellow. Publications resulting from such research credit the student's research adviser, who offers suggestions and guidance during the course of such research, with being a coauthor of the paper.

petitioner was of his own conception within the framework of the basic subject of tumor immunology that was being investigated in the laboratory of his research adviser. Petitioner's research in connection with the project extended through the entire 3-year period of the academic phase of the Surgery Program.

As was true in the case of all students participating in the academic phase of the Surgery Program, petitioner was never paid additional moneys for research conducted during evening and working hours, and was not required to work any particular number of hours. In order to receive his stipend, he was not required to sign timesheets or keep a timecard with respect to the hours he worked. Petitioner was given a great deal of freedom in the conduct of his research. However, he was subject to supervision on a periodic basis by his research adviser. Though not strictly required, it was customary for medical fellows to meet with their advisers once or twice a week for guidance and consultation.

During the 3 years making up the academic phase of his Surgery Program, petitioner enrolled in the following graduate school courses:

| Course number | Description |
|---|---|
| 8201 | Surgical-Roentgenological Conference |
| 8202 | Surgical Research |
| 8203 | Surgical Complications and Research Conference |
| 8207 | Transplantation and Bone Marrow Conference |
| 5274 | Molecular Aspects of Immunology |
| 5218 | Immunology |
| 8218 | Immunochemistry and Immunobiology |
| 5424 | Biology of Viruses |
| 5105 | Biology of Micro-organisms |
| 5321 | Physiology of Bacteria |
| 5232 | Medical Microbiology |

Seven of these courses were in the area of microbiology, which was the subject of petitioner's minor or supporting work. These courses required the attendance of lectures and the completion of oral and written assignments. Petitioner also participated in three conference courses. The conferences, held in large auditoriums, featured formal presentations by faculty members and guest lecturers. Additionally, papers published by medical fellows occasionally were presented to the conference by the authors of such papers. The final course

was petitioner's research project. All students, including petitioner, received an academic grade upon the completion of their research projects as well as their other courses.

During the years in question, petitioner did not treat any patients or participate in patient rounds. He did not perform any routine patient-care related activities such as ordering prescriptions, writing treatment orders for patient care, taking patients' physical and medical histories, etc. He did not diagnose patients, perform any medical or surgical procedures, or teach junior medical fellows or medical students. During the academic phase, petitioner was never on call and did not work in any emergency room. Moreover, like other students participating in the academic phase of the Surgery Program, petitioner did not experiment with human beings at any time during the course of his research.

*Research Grants*

As stated, one of the principal missions of the University of Minnesota is the performance of research. To finance such research, it is necessary for the university to obtain funds from Federal and private sources. Competition for such funds is keen. Criteria used in distributing research grants include scientific merit, the reputation of the individual investigator (including medical fellows), and the reputation of the faculty and institution. Grants are always awarded to the university, itself, and not in the name of any individual.

There are two types of research conducted at the University of Minnesota—contract research and educational research. Contract research generally refers to a specific research project undertaken at the request of a business entity, academic or charitable institution, or Government agency. The expense of such research is borne by the entity or institution. The research is usually directed toward immediate practical application of the investigative results. Contract research is conducted by researchers and technicians who are full-time employees paid from the contract funds on the basis of a civil service classification. Graduate students enrolled in the Surgery Program do not conduct contract research.

By contrast, educational research is not undertaken for the benefit of any contracting entity. Consequently, such research is not directly financed by such entities, but by research

training grants awarded by various Federal and private sources. Research training grants are used to defray the direct costs of research which include, inter alia, the payment of stipends.[8] In the instant case, petitioner was the recipient of a research training grant.

## The Stipend

Once a medical fellow becomes a candidate for an advanced degree within one of the graduate school programs, he receives what the University of Minnesota terms a "medical fellowship stipend." A medical fellow enters the program at the "G–1 level." All medical fellows at this level receive a uniform stipend. In the Surgery Program, the stipend is automatically increased each year as the medical fellow progresses through the program. Persons accepted into the advanced degree program in surgery almost invariably receive stipends for the whole period in which they are enrolled in the program.

The amount of the medical fellowship stipend is determined by an education committee made up of department heads at the University Medical School. The stipend amount has been kept commensurate with amounts paid to residents in other programs across the Midwest. The amount paid to a particular medical fellow is determined by reference to schedules promulgated by the education committee in conjunction with the Council of Affiliated Hospitals, the latter of which is composed of the staff heads of the various clinical departments within the affiliated hospitals where graduate courses are offered for academic credit.

The floor amount of a medical fellowship stipend is based upon the perceived needs of a "typical" or "average" graduate medical student (and his family) during the period of enrollment. The individual needs of the recipient are not examined.

During the clinical phase, the stipends paid to the students are derived from a variety of sources, including the hospitals affiliated with the University of Minnesota at which the students receive their residency training. The funds for

---

[8]Contract research grants are awarded to defray both indirect and direct costs of research. Indirect costs are the overhead associated with operating the laboratory. Direct costs, in the case of contract research grants, include payment of the salaries of technicians and employees.

stipend payments to students during the academic phase are derived from the University of Minnesota educational funds, Public Health Service grants, National Institutes of Health grants, National Research Service awards, and private donors.

The primary source of funds used by the university to pay petitioner's stipend during his academic phase was a cancer training grant from the U.S. Public Health Service. All of his stipend came from such source in 1974, as did most of the 1975 stipend. A portion of petitioner's 1975 stipend was paid for with moneys from the University of Minnesota Department of Surgery Education Fund.

For the period between January 1, 1974, and December 31, 1974, petitioner received a stipend because of his participation in the Surgery Program in the amount of $11,200.08. For the period between January 1, 1975, and December 31, 1975, petitioner received a stipend in the amount of $12,150. No Federal or State income or employment taxes were withheld by the University of Minnesota from such stipends and they were not included by petitioner in income for the relevant taxable years. In his statutory notice, respondent determined that the stipends were fully includable in petitioner's income and consequently determined deficiencies for 1974 and 1975.

OPINION

The sole issue for our decision is whether the stipend payments received by petitioner during 1974 and 1975 qualify for exclusion from gross income pursuant to section 117.

Section 117(a) excludes from the gross income of an individual any amount received as a scholarship or fellowship grant. In the case of an individual who is a candidate for a degree, this general exclusion is delimited by section 117(b)(1).[9] However, such limitation, and the exception contained therein, is only

---

[9]Sec. 117(b)(1) provides as follows:

SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

  (b) LIMITATIONS.—

    (1) INDIVIDUALS WHO ARE CANDIDATES FOR DEGREES.—In the case of an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such

applicable if the payment in question first has been found to constitute a scholarship or fellowship grant. *Reese v. Commissioner*, 45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967).

The terms "scholarship" and "fellowship grant" are not defined in the statute. Section 1.117–3(c), Income Tax Regs., defines "fellowship grant" as an amount "paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." See *Weinberg v. Commissioner*, 64 T.C. 771, 776 (1975); *Reese v. Commissioner, supra* at 411. The regulations define "scholarship" in a similar manner. Sec. 1.117–3(a), Income Tax Regs.

The test to be applied is whether the primary purpose underlying the payment was to educate the recipient or whether it was to compensate him for services rendered. *Weinberg v. Commissioner, supra* at 776. Thus, if an amount paid "represents either compensation for past, present, or future employment services," then such amount is not to be considered as an amount received as a scholarship or a fellowship grant for purposes of section 117. Sec. 1.117–4(c), Income Tax Regs. The validity of section 1.117–4(c), Income Tax Regs., was upheld in *Bingler v. Johnson*, 394 U.S. 741, 751 (1969), wherein the Supreme Court declared:

the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial *quid pro quo* from the recipients.

Accordingly, our inquiry is reduced to whether the stipends paid to petitioner were intended primarily to be in return for his services—past, present, or future—or whether they were intended to furnish him an opportunity to pursue research for his own individual benefit. Petitioner bears the burden of proof in this respect. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioner argues that the academic phase of the Surgery Program is completely separable from the clinical phase and

---

degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.

that the stipends received by him during the academic phase, unlike those received during the clinical phase, were not compensatory in nature. Respondent counters with the assertion that the Surgery Program must be viewed as a whole and that, when so viewed, the stipends paid during the academic phase constitute payments in compensation for services rendered and must be included in income.

The issue of the includability in gross income of moneys paid to a medical intern or resident frequently has been litigated in recent years with the almost invariable outcome of such litigation going against the taxpayer-physician. See, e.g., *Birnbaum v. Commissioner*, 474 F.2d 1339 (3d Cir. 1973), affg. without published opinion a Memorandum Opinion of this Court; *Parr v. United States*, 469 F.2d 1156 (5th Cir. 1972); *Hembree v. United States*, 464 F.2d 1262 (4th Cir. 1972); *Rundell v. Commissioner*, 455 F.2d 639 (5th Cir. 1972), affg. per curiam a Memorandum Opinion of this Court; *Wertzberger v. United States*, 441 F.2d 1166 (8th Cir. 1971); *Woddail v. Commissioner*, 321 F.2d 721 (10th Cir. 1963), affg. a Memorandum Opinion of this Court; *Weinberg v. Commissioner*, 64 T.C. 771 (1975); *Dietz v. Commissioner*, 62 T.C. 578 (1974); *Moll v. Commissioner*, 57 T.C. 579 (1972); *Fisher v. Commissioner*, 56 T.C. 1201 (1971); *Anderson v. Commissioner*, 54 T.C. 1547 (1970); *Proskey v. Commissioner*, 51 T.C. 918 (1969). The courts in these cases all concluded that because the intern or resident furnished valuable services for the grantor of the fellowship in return for the payments received, such payments were compensatory and therefore includable in income.

Unlike the typical medical residency program, the residency program in the instant case combined an academic phase with the traditional clinical phase, the two of which in combination satisfied the requirements for an advanced degree. This dual program itself has been the subject of repeated litigation. The recent cases dealing with the University of Minnesota program have held that the disputed payments were not excludable from gross income. See *Rockswold v. United States*, 620 F.2d 166 (8th Cir. 1980); *Quast v. United States*, 428 F.2d 750 (8th Cir. 1970); *Johnson v. United States*, 507 F. Supp. 663 (D. Minn. 1981); *Nino v. Commissioner*, T.C. Memo. 1980–204; *Rogers v. Commissioner*, T.C. Memo. 1980–171; *Ulvestad v. Commissioner*, T.C. Memo. 1979–60; *Hof v. Commissioner*, T.C.

Memo. 1979–55; *Eckes v. Commissioner*, T.C. Memo. 1978–192.[10]

This is not the first time petitioner has been to court, either. In *Rockswold v. United States*, 471 F. Supp. 1385 (D. Minn. 1979), petitioner and two other physicians sought refunds of the taxes attributable to amounts included in income which were paid to them in the form of stipends. The trio of litigants were all medical fellows and candidates for the advanced Ph. D. degree during the years in question. The contested stipends were paid to them during the clinical phase of the advanced medical degree program. Following a course clearly delineated by prior case law, the District Court of Minnesota held that, during the clinical phase, the three plaintiffs provided substantial and valuable services to the hospitals in which they worked in return for the payments received. Accordingly, the stipends were held not to constitute scholarships or fellowship grants within the meaning of section 117.

*Rockswold* was appealed to the Eighth Circuit, the court to which this case is also appealable. In affirming the lower court, the Court of Appeals declared that as long as the threshold question of whether the stipends were paid as a quid pro quo for the services rendered is answered in the affirmative, the fact that such services only consumed a portion of the medical fellows' time is not controlling. *Rockswold v. United States*, 620 F.2d at 169. The court cited a long string of cases in which residents in nondegree programs had sought unsuccessfully to exclude a portion of their stipends from gross income. *Rockswold v. United States, supra* at 169 n. 5.

In *Johnson v. United States*, 507 F. Supp. 663 (D. Minn. 1981), the plaintiff, a candidate for the advanced degree in surgery at the University of Minnesota, sought an income tax refund on the basis of his contention that 60 percent of a stipend received in 1974 should be excluded from his income. During the entire first half of 1974, plaintiff was engaged in

---

[10]In *Anderson v. United States*, an unreported case (D. Minn. 1960, 7 AFTR 2d 726, 61–1 USTC par. 9162), the taxpayer-physician, a graduate student attending the University of Minnesota during the year in issue, received a favorable jury verdict with respect to the excludability of alleged fellowship grants paid to him during the 1958 taxable year. This decision, however, lost its force after *Bingler v. Johnson*, 394 U.S. 741 (1969), which undermined the jury instructions upon which the decision was based. See *Nino v. Commissioner*, T.C. Memo. 1980–204.

the academic phase of the Surgery Program. He testified that 20 percent of his time was devoted to research in the second half, with the remaining 80 percent devoted to clinical activities. In denying exclusion from income of the fraction of the stipend, the U.S. District Court held that the advanced degree program in surgery was not divisible for purposes of establishing an exclusion under section 117.[11]

The integrated approach adopted by the *Johnson* court was based upon Eighth Circuit precedent as established by *Leathers v. United States*, 471 F.2d 856, 861 (8th Cir. 1972), cert. denied 412 U.S. 932 (1973), where, in determining the excludability of stipends received by residents in the residency program of the University of Arkansas, the Circuit Court stated that it was necessary to look at the residency program as a whole rather than at one segment of it. We agree with respondent that the Surgery Program of the University of Minnesota must be viewed in its entirety in determining whether the stipends paid to petitioner during his participation in the academic phase of the program are excludable from gross income. In so doing, we endorse the analysis of the Minnesota District Court in *Johnson v. United States, supra,* and its conclusion that the Surgery Program must be viewed as an indivisible whole.

Such an approach is not unique to the Eighth Circuit. The Tax Court has employed a unitary approach on a number of occasions. See *Dietz v. Commissioner*, 62 T.C. 578, 585 (1974); *Ehrhart v. Commissioner*, 57 T.C. 872, 883 (1972), affd. 470 F.2d 940 (1st Cir. 1973).[12] Other courts similarly have found

---

[11]In so holding, the court stated as follows:

"In *Rockswold*, the plaintiffs took the position that the advanced degree program should be considered as a whole in determining whether or not the stipends received by medical fellows are 'scholarships' or 'fellowship grants' within the meaning of I.R.C. §117. In this case, however, the same counsel argues that the program should not be considered as a whole, but should be divided between clinical, academic and research activities and a partial exclusion allowed. We hold that the facts are substantially the same, the guiding legal principles the same, and that the advanced degree program is not divisible for the purposes of a Section 117 exclusion. [507 F. Supp. at 664.]"

[12]See also *Koch v. Commissioner*, T.C. Memo. 1979–147. In *Nino v. Commissioner*, T.C. Memo. 1980–204, a case dealing with the stipends received by a medical fellow attending the University of Minnesota, we stated:

"We think it not without significance that there are some indications that the program as a whole involved substantial services and that it is not inappropriate to infer that the stipend for the taxable year in question (which included the end of petitioner's second and the

residency programs not to be divisible into educational and service components. See *Burstein v. United States*, 224 Ct. Cl. 1, 622 F.2d 529, 535 (1980), *Woddail v. Commissioner*, 321 F.2d 721, 724–725 (10th Cir. 1963), affg. a Memorandum Opinion of this Court.

While cognizant of the fact that the research and clinical phases of the Minnesota advanced degree program are more clearly demarcated than are the service and nonservice portions of the typical residency program, we do not believe that this necessarily requires us to fragment the Surgery Program and ignore the totality of the activities required of the medical resident. There seemed to be little factual dispute in *Johnson v. United States, supra*, with respect to the respective amounts of time engaged in research as opposed to clinical work during the year before the court. Nevertheless, the program was viewed as a whole.[13]

The Surgery Program is a unified program leading to an advanced degree. Both the clinical and academic portions of the program must be completed in order to satisfy the degree requirements. The academic phase builds upon the knowledge and experience gained during the initial clinical years and, in turn, the final clinical years are augmented by the knowledge and experience picked up during the academic phase. The complementary nature of the requirements for obtaining the advanced degree blurs any clear division between the two phases that petitioner contends is present. We believe that each succeeding year of the program builds upon the prior year, that fulfillment of the two components of the Surgery Program indivisibly coalesce to bring the medical fellow to a level of skill and education sufficient to qualify him for the advanced degree.

beginning of his third year in the program) may well have represented additional compensation for services rendered during the earlier part of his second year and during his first year."

[13]In *Koch v. Commissioner*, T.C. Memo. 1979–147, despite a stipulation that petitioner, a dental school resident, spent 70 percent of the first 6 months of the year in question engaged in classroom work, this Court held that the entire amount received during the year was taxable. This result stemmed from our decision "to consider the residency program as a whole in order to evaluate the nature and purpose of the payments received by petitioner." Thus, the absence of an overlap between or a factual dispute over the respective amounts of time devoted to service versus nonservice activities does not require the abandonment of the integrated approach to testing the nature of stipend payments.

The receipt of stipend payments by entering medical fellows is virtually automatic. The amount received by each fellow is fixed at a uniform level and rises during the ensuing years by uniform gradations. There was no evidence that any medical fellow ever suffered termination of such payments during the later years of his participation in the Surgery Program. In essence, stipend assistance throughout the 7-year program is assured from the very beginning. This is particularly illuminating in light of the fact that the academic phase is of no fixed duration. The record indicates by stipulated fact that the academic phase *usually* begins in the third year and *sometimes* continues into the fifth year. The commencement and completion of this portion of the program apparently varies with the individual. However, the stipend amount, which is determined by an education committee composed of the department heads at the university medical school, is set at the outset of the program, and rises automatically thereafter, without reference to whether the medical fellow currently is participating in the clinical or academic phase of the program. Thus, from the very outset, the fifth-year medical fellow is assured precisely the same stipend benefit regardless of whether such year finds him engaged in the clinical phase of the program, the academic phase, or a combination of the two. The fact that the stipend payments are set from the beginning is indicative of a unified approach to the awarding of stipend payments. Such approach carries with it a unified purpose that, on these facts, does not vary according to whether the medical fellow is involved in research or clinical activities.[14]

Much of petitioner's case is based upon the testimony of Dr. H. Mead Cavert, associate dean of the University of Minnesota Medical School, and Dr. John S. Najarian, chairman of the department of surgery of the University of Minnesota Hospitals, chief of surgery at the University Hospitals, and director of graduate education in surgery. We do not accept as

---

[14]In *Johnson v. United States,* 507 F. Supp. 663 (D. Minn. 1981), the Minnesota District Court held that the fact that the taxpayer-physician was able to separate the time devoted during the taxable year into academic and clinical components was not sufficient to warrant a holding that there were two different purposes underlying the stipend paid to him that year. Similarly, simply because petitioner herein was able to segregate all of his academic phase activities into the 2 years at issue is not grounds for abandoning a unified evaluation of the stipend payments.

dispositive of the issue before us their testimony with its conclusory statements to the effect that petitioner's stipends were intended to further his education or compensate him for services rendered and that the Surgery Program is severable for purposes of allocating such alternative intentions into two distinct components. As we said in *Nino v. Commissioner*, T.C. Memo. 1980–204—

The University of Minnesota and its affiliated hospitals have an interest in having the payments made to their residents held to be nontaxable. See *Rockswold v. United States*, * * * 471 F. Supp. 1385, 1386 n. 1 (D. Minn. 1979) * * *

Petitioner, in arguing that the Surgery Program is severable, emphasized that either the clinical or academic portions of the program could be completed at a school other than the University of Minnesota. We do not believe that this "exchange" program was as significant as petitioner asserts. In this respect, we find the testimony with respect to Dr. Christian Barnaard, who participated in the program in the late 1950's, irrelevant. The vagueness of the other testimony in this connection greatly detracts from any weight it might otherwise carry. Dr. Najarian testified that he could remember three specific occasions where a fellow completed his research at another institution. The testimony in this respect was extremely brief and inexact. There was no evidence that the three unnamed individuals were practicing surgeons or that such individuals ever returned to the Minnesota program. Finally, and most importantly, there is no evidence that such persons continued to receive stipends from the university or the affiliated hospitals during their period of absence.[15] In such case, the forfeited funds presumably would be applied to the payment of the stipends of medical fellows enrolled at the University of Minnesota. In sum, we do not believe that the existence of an occasional peripatetic student changes the integral nature of the Surgery Program and the accompanying stipend mechanism. Finally, we expressly note that we are not implying that a different result would obtain if the academic portion were undertaken at a different institution.

---

[15]While his statement was admittedly ambiguous, we note that Dr. Cavert testified that "visiting" students did not receive stipends.

Having concluded that we must evaluate the Surgery Program as a whole, we now turn to the basic question of whether the stipends were received in compensation for services rendered. Because the program is unified, the clinical activities of petitioner are relevant in this analysis. In this connection, we do not deem it appropriate to reiterate the detailed activities conducted during the clinical years. We already have found, on facts quite similar to the facts herein, that payments received by a candidate for an advanced degree in surgery at Marquette University were compensatory in nature and therefore taxable as income. See *Rosenthal v. Commissioner*, 63 T.C. 454 (1975). Moreover, the stipend received during one of the clinical years of the very petitioner litigating the instant case was the subject of earlier litigation in Minnesota District Court. See *Rockswold v. United States*, 471 F. Supp. 1385 (D. Minn. 1979). Petitioner unsuccessfully appealed the unfavorable decision of that court to the Eighth Circuit. See *Rockswold v. United States*, 620 F.2d 166 (8th Cir. 1980). We follow this decision in finding that a quid pro quo existed with respect to the clinical portion of the Surgery Program.[16]

This clinical portion, which could last into the third year and recommence in the fifth year, blended into an academic phase during which the medical fellow utilized the experience obtained during the clinical years. The application of such experience and the research skills developed during such time made the medical fellow a much more valuable asset during his final clinical years. In such cases, where some of the benefits of training are deferred, stipends received during a nonclinical phase may in part represent additional compensation for past and future services. See *Nino v. Commissioner*, *supra.*

The payments received by petitioner were based upon length of service, not upon individual need. Such basis is one that is characteristic of a compensatory arrangement. See *Adams v. Commissioner*, 71 T.C. 477, 487 (1978); *Dietz v. Commissioner*, 62 T.C. 578, 586 (1974); *Jamieson v. Commissioner*, 51 T.C. 635,

---

[16]See also *Nino v. Commissioner*, T.C. Memo. 1980–204; *Rogers v. Commissioner*, T.C. Memo. 1980–171; *Ulvestad v. Commissioner*, T.C. Memo. 1979–60; *Hof v. Commissioner*, T.C. Memo. 1979–55; *Eckes v. Commissioner*, T.C. Memo. 1978–192.

639 (1969); *Proskey v. Commissioner,* 51 T.C. 918, 924 (1969). Furthermore, because the stipends were automatically paid to entering candidates, it is safe to conclude that they were not paid in recognition of special merit displayed by petitioner in his prior academic work. This likewise is indicative of a quid pro quo. See *Adams v. Commissioner, supra* at 487; compare *Steiman v. Commissioner,* 56 T.C. 1350, 1355 (1971). The magnitude of petitioner's yearly stipend is, in itself, suggestive of compensation rather than a fellowship. See *Brubakken v. Commissioner,* 67 T.C. 249, 258 (1976); *Zolnay v. Commissioner,* 49 T.C. 389, 397 (1968).[17]

In addition to the indirect benefits that accrue to the hospitals as a result of a medical fellow's training during the academic phase, the activities of the fellow during such time also confer a direct benefit on the university.[18] First, the University of Minnesota retains a right to share in any royalties produced from patentable research performed by a medical fellow. Similarly, publications resulting from such research credit the student's research adviser, who offers suggestions and guidance during the course of the research, with being a coauthor of the paper. Thus, the university retains a pecuniary interest in all research conducted by the medical fellows. Finally, distinguished research has the effect of enhancing the reputation of the university, which, in turn, gives the university an edge in the characteristically tight competition for research funds. Although such direct benefits do not decisively establish a compensatory arrangement, when examined in light of the entirety of the Surgery Program, they do contribute to the compensatory character of the stipend payments.

We have been called upon to determine the primary purpose behind the payments in controversy. The purpose of the medical fellow in pursuing the advanced degree is irrelevant,

---

[17]See also *Nino v. Commissioner,* T.C. Memo. 1980–204.

[18]As in *Ulvestad v. Commissioner,* T.C. Memo. 1979–60, we believe that the university and affiliated hospitals should be viewed as inseparable parts of an interrelated and interdependent residency program. Accordingly, these institutions jointly constitute "the grantor" of the stipends.

as is the general purpose of the residency program. *Bailey v. Commissioner*, 60 T.C. 447, 452 (1973).[19] In determining the purpose of the grantor in making the payments, we believe that the ultimate source of the stipends is of little importance. See *Bailey v. Commissioner, supra* at 452. We find that the program as a whole involved substantial services and thus the primary purpose underlying the stipend payments was to compensate petitioner for services rendered. Therefore, such payments are includable in petitioner's gross income.

*Decision will be entered for the respondent.*

---

[19]See also *Dietrich v. Commissioner*, T.C. Memo. 1974–16, affd. per curium 503 F.2d 1379 (8th Cir. 1974); *Ulvestad v. Commissioner*, T.C. Memo. 1979–60.