THOMAS E. KERSTEN AND HILLE A. KERSTEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kersten v. Commissioner
Docket Nos. 7369-81, 11793-81, 13065-81, 18372-82.
United States Tax Court
T.C. Memo 1984-204; 1984 Tax Ct. Memo LEXIS 462; 47 T.C.M. (CCH) 1594; T.C.M. (RIA) 84204; April 24, 1984. Christine R. Mayer, for the petitioners. Dale L. Newland, *463 for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: Respondent determined deficiencies in Frderal income taxes against the petitioners in these cases as follows: Petitioners
Docket No.
Taxable year ended
Deficiency
Thomas E. and
Hille A. Kersten
7369-81
December 31, 1977
$ 3,462
Daniel and Connie
11793-81
December 31, 1977
2,985
Dunn
December 31, 1978
3,327
Robert W. and
13065-81
December 31, 1977
3,739
Ann Emery
December 31, 1978
4,303
18372-82
December 31, 1979
1,958
After concessions, the sole issue for our decision in each case is whether certain payments received by petitioners Thomas E. Kersten, Daniel Dunn and Robert W. Emery, during the years in issue, qualify for exclusion from gross income pursuant to section 117. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of *464 facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Thomas E. Kersten (hereinafter referred to as "Kersten") and his wife, Hille A. Kersten; and Robert W. Emery (hereinafter referred to as "Emery") and his wife Ann Emery, resided in Minneapolis, Minnesota at the time of filling their petitions herein. Petitioners Daniel Dunn (hereinafter referred to as "Dunn") and his wife, Connie Dunn, resided in St. Louis Park, Minnesota at the time of filing their petition herein. Petitioners Kersten, Dunn and Emery filed joint Federal income tax returns for each of the taxable years in issue. [3]
In 1968, petitioner Kersten graduated from Baylor University College of Medicine with an M.D. degree; in June 1973, petitioner Dunn graduated from Creighton University Medical School with an M.D. degree; and in June 1973, petitioner Emery graduated from Tufts Medical School with an M.D. degree. Thereafter, each petitioner participated in a surgical internship *465 at the University of Minnesota Hospitals, as follows: Petitioner
Dates of surgical interniship
Kersten
July 1968 - June 1969
Dunn
July 1973 - June 1974
Emery
July 1973 - June 1974
Following completion of his surgical internship, each petitioner enrolled as a student in the Graduate School Surgery Program at the University of Minnesota (hereinafter referred to as "Surgery Program"), as follows: Petitioner
Dates of enrollment in Surgery Program
Kersten
July 1972
Dunn
July 1974
Emery
July 1974
The University of Minnesota is an educational institution described in section 170(b)(1)(A)(ii). It operates on an academic-year basis, with such year commencing on July 1 of each year and ending on June 30 of the following year. The Surgery Program at the University of Minnesota is designed to be a seven-year program, the ultimate objective of which is to train physicians for the practice of surgery and for positions in academic surgery. Completion of the Surgery Program, however, requires the submission of an acceptable thesis, which may occur in excess of seven years after a student commences the program. The Surgery Program contains *466 a traditional clinical residency program wherein physicians obtain the training and experience necessary to become certified in a medical specialty. In addition, the Surgery Program requires the completion of an academically-oriented program which combines formal course work with research, writing and thesis requirements. This academic program is required of all candidates for advanced degrees in surgery, but is not required of University of Minnesota surgery residents in general. Student participants in the Surgery Program (hereinafter referred to as "medical fellows") must satisfy both the clinical and academic portions of the program to receive a Ph. D. degree. Historically, however, more than one-half of the medical fellows leave the Surgery Program without completing the degree requirements. Medical fellows possess all of the rights, privileges and restrictions of student status at the University of Minnesota. A medical fellow has no obligations beyond his obligations as a student and a responsibility to observe the rules of the hospital to which he is assigned while enrolled in clinical courses. Medical fellows have no contractual obligation to anyone, arising from *467 such status, at the time of completion of their studies. The Surgery Program is divided into three segments. During the first two years, the degree candidate is engaged in the clinical phase of the program. The academic phase, which is uninterrupted, usually begins in the third year and sometimes continues into or through the fifth year of the program. The remaining years are devoted to the completion of the clinical phase. [4]
(1) The initial clinical phase: Kersten, Dunn and Emery
Petitioners Kersten, Dunn and Emery participated in the initial clinical phase of the Surgery Program, during the following periods: Dates of participation in
Petitioner
initial clinical phase
Kersten
August 1972 - June 1974
Dunn
Jury 1974 - December 1976
Emery
July 1974 - August 1976
During these periods, petitioners Kersten, Dunn and Emery devoted most of *468 their time to required clinical courses involving the management of surgical patients. They also attended a weekly review of topical roentgen findings that had arisen from the treatment of surgical patients, and were credited with being the surgeons, [5] or with assisting, in a number of surgical operations. (2) The academic phase
Petitioners Kersten and Dunn participated in the academic phase of the Surgery Program, during the following periods: Dates of participation in
Petitioner
academic phase
Kersten
July 1974 - June 1977
Dunn
January 1977 - June 1978
In September 1976, [6] following his completion of the initial clinical phase of the Surgery Program, petitioner Emery transferred out of the academic phase of the Surgery Program, and into the Ph. D. degree program in the Department of Physiology at the University of Minnesota (hereinafter referred to as the "Physiology Program"). Unlike the Surgery Program, the Physiology Program consisted solely of an academic phase during which petitioner Emery was *469 a candidate for a Ph. D. degree in physiology. Emery completed this Physiology Program in June 1979, at which time he reentered the Surgery Program, in order to complete its final clinical phase. While petitioners Kersten and Dunn were candidates for Ph. D. degrees in surgery throughout the respective periods in issue in docket numbers 7369-81 and 11793-81, therefore, petitioner Emery was a candidate for a ph. D. degree in physiology throughout the periods in issue in docket numbers 13065-81 and 18372-82. (a) Kersten and Dunn (Surgery Program)
The academic phase of the Surgery Porgram affords qualified medical students an opportunity to participate in an academic surgerty course of study in addition to the traditional residency training necessary to become board certified in the medical specialty of general surgery. [7] It also furthers one-of the principal missions of the University *470 of Minnesota - the performance of research. To fulfill the requirements of the academic phase, a candidate for a degree in the Surgery Program must generally spend approximately two to three years in the laboratory doing research, performing experiments, and compiling data. Students are required to spend a considerable amount of time performing medical research to satisfy the research and thesis requirements of the Surgery Program. The thesis is prepared on the basis of such research. [8] In addition, candidates must complete from eighteen to twenty-four quarter credits in a nonclinical field to be offered as the minor or supporting program for the Ph. D. degree. During the period from July 1974 to June 1977, when petitioner Kersten was engaged in the academic phase of the Surgery Program, he spent at least the majority of his time performing research on dogs in the experimental pulmonary physiology laboratory, *471 concerning pulmonary shunt mechanisms in atelectasis, ischemia and hemorrhagic shock. During this period, Kersten also completed formal classroom courses necessary to satisfy him minor or supporting program requirement, including course work in the areas of surgery, physiology and pathology. During the period from January 1977 to June 1978, when petitioner Dunn was engaged in the academic phase of the Surgery Program, he spent at least the majority of his time performing research in gastrin cell physiology. During this period, Dunn also completed formal classroom courses necessary to satisfy his minor or supporting program requirement, including course work in the areas of surgery and physiology. The foregoing research projects chosen by Kersten and Dunn [9] were of their own conception within the framework of the subject matter that was being investigated in the laboratories of their research advisors. Kersten and Dunn were given a great deal of freedom in the conduct of their research, subject to the guidance and advice of their research advisors. *472 Petitioners Kersten and Dunn did not perform any activities in the nature of residency services at the so-called affiliated hospitals within the Twin Cities area, which included the University of Minnesota Hospitals, the Minneapolis Veteran's Administration Hospital, Methodist Hospital and St. Paul-Ramsey Hospital (hereinafter referred to as "the affiliated hospitals"), during the foregoing periods when they were involved in the academic phase of the Surgery Program. (b) Emery (Physiology Program)
During petitioner Emery's hiatus from the Surgery Program, between September 1976 and June 1979, he pursued a Ph. D. degree in physiology, spending at least the majority of his time performing research concerning certain heart to body reflexes. [10] During this period, Emery also completed formal classroom courses necessary to satisfy his minor or supporting grogram requirements, including course work in the areas of surgery, physiology and anesthesiology. *473 The foregoing research project chosen by Emery was of his own conception within the framework of the subject matter that was being investigated in the laboratory of his research advisor. Emery was given a great deal of freedom in the conduct of his research, subject to the guidance and advice of his research advisor. Like Kersten and Dunn, Emery did not perform any activities in the nature of residency services at the affiliated hospitals during the period he was involved in the Physiology Program. (3) The final clinical phase: Kersten, Dunn and Emery
Petitioners Kersten, Dunn and Emery participated in the final clinical phase of the Surgery Program, during the following periods: Dates of participation in
Petitioner
final clinical phase
Kersten
July 1977 - December 1982
Dunn
July 1979 - December 1979
Emery
July 1979 - December 1979
During the foregoing periods, petitioners were credited with being the surgeons, or with assisting, in a number of surgical operations. As part of their clinical activities during this final phase, petitioners were required to be "on call" from two to five nights during the week and on weekends. The frequency *474 of their duties while on call varied according to the hospitals to which they were assigned and to the number of medical fellows assigned to their service. While they were on call, petitioners were responsible for responding to emergencies or problems which might develop in a patient's condition. Normally, when called to the hospital in such situations, petitioners would analyze the situation and discuss it with the chief resident, who in turn would consult with the staff doctor. During the final year of the Surgery Program, medical fellows are required to act as chief residents at one of the affiliated hospitals. In this position, they are on call twenty-four hours a day and are required to assume extensive supervisory and administrative responsibilities, including running their own services, teaching medical students and interns, and scheduling and supervising the other residents and mecial fellows. In addition to the afore-described functions, petitioners Kersten, Emery and Dunn engaged in numerous other activities relating to the treatment of hospital patients while participating in one or both phases of the clinical portion of the Surgery Program. 4. The stipends
*475 Once a medical fellow becomes a candidate for an advanced degree within one of the graduate school programs, he receives what the University of Minnesota terms a "medical fellowship stipend." A medical fellow enters the program at the "G-1 level." All medical fellows at this level receive a uniform stipend. Generally, in the Surgery Program, the stipend is automatically increased each year as the medical fellow progresses through the program. The maximum amount of the medical fellowship stipend which each department may pay is determined by an education committee made up of department heads at the University Medical School. The stipend amount has been kept commensurate with amounts paid to residents in other programs across the Midwest. The amount paid to a particular medical fellow is determined by reference to schedules promulgated by this education committee in conjunction with the Council of Affiliated Hospitals, which is composed of the staff heads of the various clinical departments within the affiliated hospitals where graduate courses are offered for academic credit. The amount of a medical fellowship stipend is based upon the perceived needs of a "typical" or "average" *476 graduate medical student (and his family) during the period of enrollment. The individual needs of the recipient are not examined. During the clinical phases, the stipends paid to the students are derived from a variety of sources, including those hospitals affiliated with the University of Minnesota at which the students receive their residency training. The funds for stipend payments to students during the academic phase are derived from the University of Minnesota educational funds, U.S. Public Health Service (hereinafter referred to as "PHS") grants, National Institutes of Health grants, National Research Service (hereinafter referred to as "NRS") awards, and private donors. During their enrollment at the University of Minnesota, petitioners Kersten, Dunn and Emery received stipends from the afore-described grantors, as follows: Petitioner
Year
Grantor
Amount
Kersten
1972
University of Minnesota
$2,900.00
1973
University of Minnesota
4,350.00
Veterans Hospital
5,401.88
1974
Veterans Administration
5,935.38
NRS Award
[11]
1975
PHS fellowship
1976
PHS fellowship
University of Minnesota
6,650.04
1977
University of Minnesota
13,650.12
1978
Veterans Administration
13,020.99
University of Minnesota
3,500.00
1979
Veterans Administration
19,692.66
1980
Veterans Administration
11,869.49
University of Minnesota
9,500.00
Dunn
1974
Veterans Administration
Hospital
12,265.00
1975
Veterans Administration
Hospital
12,740.82
1976
Veterans Administration
Hospital
7,032.92
University of Minnesota
6,000.00
1977
University of Minnesota
13,000.00
1978
University of Minnesota
6,750.00
Veterans Administration
Hospital
8,821.16
1979
Veterans Administration
Hospital
19,000.00
Emery
1974
University of Minnesota
5,100.00
1975
University of Minnesota
10,850.04
1976
University of Minnesota
12,000.12
1977
University of Minnesota
13,000.08
1978
University of Minnesota
14,000.15
1979
University of Minnesota
7,250.04
Veterans Hospital
9,500.00
1980
Veterans Hospital
16,941.00
University of Minnesota
3,166.66
*477 No Federal or State income taxes were withheld by the University of Minnesota from the foregoing stipends for the years in issue, and they were not included by petitioners in income for said taxable years, except for petitioner Emery, who reported the $9,500 stipend for the period July 1979 to December 1979. In his statutory notices, respondent determined that such stipends were fully includable in the gross income of each petitioner, and consequently determined the deficiencies, described supra.[12]
Each petitioner now concedes that stipends awarded to him during service as a medical resident in surgery, are not excludable fellowships or scholarships pursuant to section 117. For the tax years in issue, such conceded amounts include the following stipends, excluded from gross income by petitioners Kersten and Dunn, but included in gross income by petitioner Emery, *478 and attributable solely to periods when each petitioner was participating in the final clinical phase of the program: Petitioner
Period
Amount conceded
Kersten
July 1977 - December 1977
$7,000.08
Dunn
July 1978 - December 1978
8,821.00
Emery
July 1979 - December 1979
9,500.00
After these concessions, petitioners claim that the remaining portions of their stipends during the years in issue, which were attributable solely, in the cases of Kersten and Dunn, to their participation in the academic phase of the Surgery Program, and, in the case of Emery, to his participation in the Physiology Program, and which were granted in each case by the University of Minnesota,[13] may be excluded from their gross incomes as follows: Petitioner
Period
Amount in issue
Kersten
January 1977 - June 1977
$6,650.04
Dunn
January 1977 - December 1977
13,000.00
January 1978 - June 1978
6,750.00
Emery
January 1977 - December 1977
13,000.00
January 1978 - December 1978
14,000.15
January 1979 - June 1979
7,250.04
OPINION The sole issue for our decision is whether the stipend payments received by petitioners during the years in issue, *479 and attributable solely to their participation in the academic phase of their respective graduate programs, qualify for exclusion from gross income pursuant to section 117. Section 117(a) excludes from the gross income of an individual any amount received as a scholarship or fellowship grant. In the case of an individual who is a candidate for a degree, this general exclusion is limited by section 117(b)(1). [14] However, such limitation, and the exception contained therein, is only applicable if the payment in question first has been found to constitute a scholarship or fellowship grant. Reese v. Commissioner,45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). *480 The terms "scholarship" and "fellowship grant" are not defined in the statute. Section 1.117-3(c), Income Tax Regs., defines "fellowship grant" as an amount "paid or allowed to, or for the befenit of, an individual to aid him in the pursuit of study or research." The regulations define "scholarship" in a similar manner. Section 1.117-3(a), Income Tax Regs.
The test to be applied is whether the primary purpose underlying the payment was to educate the recipient or whether it was to compensate him for services rendered. Yarlott v. Commissioner,78 T.C. 585, 595 (1982), affd. 717 F.2d 439 (8th Cir. 1983); Weinberg v. Commissioner,64 T.C. 771, 776 (1975). Thus, if an amount paid "represents either compensation for past, present, or future employment services," then such amount is not be be considered as an amount received as a scholarship or a fellowship grant for purposes of section 117. Section 1.117-4(c), Income Tax Regs., was upheld in Bingler v. Johnson,394 U.S. 741, 751 (1969). Our inquiry is accordingly reduced to whether the stipends paid to petitioners were intended primarily to be in return for their *481 services - past, present, or future - or whether they were intended to furnish them with an opportunity to pursue research for their own individual benefits. Petitioners bear the burden of proof in this respect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). As we have found, petitioners Kersten and Dunn participated in the Surgery Program for its duration, including their participation in the academic phase during the years in issue in docket Nos. 7369-81 and 11793-81. In between the clinical phases of the Surgery Program on the other hand, petitioner Emery transferred into the Physiology Program, where he remained throughout the years in issue in docket Nos. 13065-81 and 18372-82. We accordingly proceed herein, in light of the foregoing legal principles, to separate examinations of the facts presented in the cases of petitioners Kersten and Dunn, on the one hand, and petitioner Emery, on the other. 1. Kersten and Dunn
Petitioners Kersten and Dunn argue that the academic phase of the Surgery Program was completely separable from the clinical phases, and that the stipends received by them during such academic phase, unlike those received during *482 the clinical phases, were not compensatory in nature. Respondent asserts that the Surgery Program must be viewed as a whole, and that, when so viewed, the stipends paid during the academic phase constituted payments in compensation for services rendered which must be included in income. The issue of the includability in gross income of funds paid to a medical intern or resident frequently has been litigated in recent years with the almost invariable outcome of such litigation going against the taxpayer-physician. See, e.g., cases cited in Yarlott v. Commissioner,supra, at 596. In such cases, the courts have concluded that because the intern or resident furnished valuable services for the grantor of the fellowship in return for the payments received, such payments were compensatory and therefore includable in income. Unlike the typical medical residency program, the program in the instant cases combined an academic phase with the traditional clinical phases, which in combination satisfied the requirements for an advanced degree. This dual program itself has been the subject of repeated litigation, giving rise to a series of decisions holding that the disputed *483 payments were not excludable from gross income. See Yarlott v. Commissioner,supra,78 T.C. at 596-597, and cases cited therein. [15] As acknowledged by petitioners, the recent decision by this Court in Yarlott v. Commissioner,supra, discloses facts most similar to those in the instant cases. In Yarlott, facing the issue of the excludability under section 117 of stipends received by a medical fellow during the academic phase of the same Surgery Program which is at issue here, this Court reviewed a series of recent cases involving that program and other advanced degree medical programs at the University of Minnesota, including Leathers v. United States,471 F.2d 856 (8th Cir. 1972), cert. denied 412 U.S. 932 (1973), all of which have held that each such program must be viewed under section 117 as an indivisible whole. In rejecting the taxpayer's contention in Yarlott for a fragmentation of the Surgery Program into its clinical and academic phases, we held, in pertinent part, as follows: The Surgery Program is a unified *484 program leading to an advanced degree. Both the clinical and academic portions of the program must be completed in order to satisfy the degree requirements. The academic phase builds upon the knowledge and experience gained during the initial clinical years and, in turn, the final clinical years are augmented by the knowledge and experience picked up during the academic phase. * * * We believe that each succeeding year of the program builds upon the prior year, that fulfillment of the two components of the Surgery Program indivisibly coalesce to bring the medical fellow to a level of skill and education sufficient to qualify him for the advanced degree. The receipt of stipend payments by entering medical fellows is virtually automatic. The amount received by each fellow is fixed at a uniform level and rises during the ensuing years by uniform gradations. There was no evidence that any medical fellow ever suffered termination of such payments during the later years of his participation in the Surgery Program. In essence, stipend assistance throughout the 7-year program is assured from the very beginning. This is particularly illuminating in light of the fact that the academic *485 phase is of no fixed duration. The record indicates by stipulated fact that the academic phase usually begins in the third year and sometimes continues into the fifth year. The commencement and completion of this portion of the program apparently varies with the individual. * * * The fact that the stipend payments are set from the beginning is indicative of a unified approach to the awarding of stipend payments. Such approach carries with it a unified purpose that, on these facts, does not vary according to whether the medical fellow is involved in research or clinical activities. [Yarlott v. Commissioner,supra,78 T.C. at 599-600, fn. ref. omitted.] In the present cases, petitioners Kersten and Dunn, similarly contending for a fragmentation of the Surgery Program into its clinical and academic phases for purposes of section 117, seek to distinguish the foregoing holding in Yarlott in several respects. First, according to petitioners, Yarlott was based upon an improper determination that both the academic and clinical phases were required of all persons enrolled in the Department of Surgery. However, this Court's adoption of the unitary *486 approach in Yarlott was based upon a finding that "[b]oth the clinical and academic portions of the program must be completed in order to satisfy the degree requirements," Yarlott v. Commissioner,supra,78 T.C. at 599, ant not upon a finding that completion of both phases was in any other sense compulsory. In the present cases, we have found by stipulated fact that the medical fellows must satisfy both portions of the program to receive a Ph. D. degree. Second, contrary to our holding in Yarlott, petitioners state that the skills and experience obtained by a medical fellow during the academic phase, do not make the resident more skillful or more valuable during his final clinical years. However, Dr. John Delaney, professor of surgery and research advisor to petitioner Dunn during the years in issue in his case, frankly testified as follows: Q. Would the person who had done the research be a better * * * clinician? A. Yes. I would certainly like to have them taking care of me -- somebody that had a scientific background. Further, in addressing his reasons for entering the Surgery Program, petitioner Emery testified as follows: *487 One of the goals I had was to be an academic surgeon. And to be an academic surgeon to my mind required a good clinical experience in one's field of interest and an academic experience. One just can't enter a laboratory and perform projects any more than one can enter an operating room and do surgery. This requires the basic education and laboratory training which was offered at the University of Minnesota, in addition to the clinical training programs. Other testimony by petitioners' witnesses indicated, with greater specificity, that the medical fellows benefited in their clinical work from the emphases during the academic phase of the Surgery Program upon statistics, scientific method, the interpretation of scientific literature, and certain surgical procedures performed on laboratory animals. Such testimony clearly belies petitioners' contentions for the divisibility of benefits obtained by medical fellows in the clinical and academic phases of the Surgery Program, and confirms the appropriateness of the unified approach adopted by this Court in Yarlott.
Having concluded that we must evaluate the Surgery Program as a whole, we now turn to the basic question of *488 whether the stipends received by Kersten and Dunn during the academic phase were received in compensation for services rendered. Because the program is unified, the fact that we have found herein, by stipulated fact - that stipends attributable to petitioners' services as medical residents in surgery were not excludable fellowships or scholarships pursuant to section 117 - is relevant to this analysis. As held by this Court in Yarlott:
This clinical portion, which could last into the third year and recommence in the fifth year, blended into an academic phase during which the medical fellow utilized the experience obtained during the clinical years. The application of such experience and the research skills developed during such time made the medical fellow a much more valuable asset during his final clinical years. In such cases, where some of the benefits of training are deferred, stipends received during nonclinical phase may in part represent additional compensation for past and future services. [Yarlott v. Commissioner,supra,78 T.C. at 602.] In holding in Yarlott that such stipends received by the taxpayer during the academic phase *489 of the Surgery Program were received in compensation for services, this Court relied, in pertinent part, upon the following: The payments received by petitioner were based upon length of service, not upon individual need. Such basis is one that is characteristic of a compensatory arrangement. Durthermore, because the stipends were automatically paid to entering candidates, it is safe to conclude that they were not paid in recognition of special merit displayed by petitioner in his prior academic work. This likewise is indicative of a quid pro quo. The magnitude of petitioner's yearly stipend is, in itself, suggestive of compensation rather than a fellowship. In addition to the indirect benefits that accrue to the hospitals as a result of a medical follow's training during the academic phase, the activities of the fellow during such time also confer a direct benefit on the university. First, the University of Minnesota retains a right to share in any royalties produced from patentable research performed by a medical fellow. Similarly, publications resulting from such research credit the student's research adviser, who offers suggestions and guidance during the course of the *490 research, with being a coauthor of the paper. Thus, the university retains a pecuniary interest in all research conducted by the medical fellows. Finally, distinguished research has the effect of enhancing the reputation of the university, which, in turn, gives the university an edge in the characteristically tight competition for research funds. Although such direct benefits do not decisively establish a compensatory arrangement, when examined in light of the entirety of the Surgery Program, they do contribute to the compensatory character of the stipend payments. [Yarlott v. Commissioner,supra,78 T.C. at 602-603. Citations omitted] While there was no evidence in the instant cases concerning whether the University of Minnesota retains a right to share in any royalties resulting from research conducted by medical fellows, our findings disclose that the remaining factual determinations in the foregoing discussion from Yarlott, pertain equally in the instant cases. Specifically, as we have found, stipends were paid to medical fellows automatically, based upon length of service, and without regard to considerations of special merit or individual need. *491 The stipends at issue here are commensurate in magnitude with the stipends considered in Yarlott, and are similarly suggestive of compensation. As in Yarlott, publications resulting from academic research by medical fellows credited as a co-author each medical fellow's research advisor, who offered suggestions and guidance during the course of the research. As candidly stated by Dr. Irwin J. Fox, a professor of physiology and research advisor for petitioner Emery: In the past, I do recall [instances where faculty members were not credited as being co-authors]. But it's almost unheard of now because you won't get funded. The fellow leaves * * * for Harvard, and how could I ever claim to NIH that I performed some work for the money they gave me, and that I deserve to be funded in the future. You see, that has taken care of that type of problem. Finally, that distinguished research reflected positively on the University of Minnesota was confirmed at trial by Dr. John Delaney, as follows: The University, of course, has the service function and the teaching function. And insofar as [Dunn's] efforts enhanced the scientific reputation of the university, the *492 university and the department benefit. So the university certainly benefits. Dr. Delaney further acknowledged that such distinguished research gave the university an edge in the competition for research funds. As we have noted in evaluating one in a long line of medical residency cases brought before this Court, "hope seems to spring eternal and the doctors continue to come to court with the argument that the facts and circumstances involved in their cases are sufficiently distinguishable from the prior cases to justify the exclusion." [16] On this record, petitioners Kersten and Dunn have failed to convince us that the facts and circumstances in their cases are sufficiently distinguishable from those in Yarlott to warrant a contrary conclusion herein. In accordance with Yarlott, we therefore hold that since the Surgery Program as a whole involved substantial services, the primary purpose underlying the stipend payments at issue was to compensate petitioners Kersten and Dunn for services rendered. Such payments are therefore includable in each such petitioner's gross income.
2. Emery
*493 As we have found, petitioner Emery temporarily departed the Surgery Program in September 1976, in order to enter the Physiology Program, where he pursued a Ph. D. degree in physiology throughout the years in issue in his cases. We note, initially, that petitioner Emery's entry into a joint motion to consolidate his cases with those of petitioners Kersten and Dunn, suggests the commonness of the facts and/or issues presented in such cases. Petitioners' complete failure to distinguish the Physiology Program from the academic phase of the Surgery Program, or to distinguish the relationship of the Physiology Program to the clinical phases of the Surgery Program from the relationship of the academic to the clinical phases of the Surgery Program, confirms this presumptive commonness of facts and /or issues. On the evidence herein, we conclude that petitioner Emery has failed to demonstrate that his cases are distinguishable in any material respect from those of petitioners Dunn and Kersten. In accordance with Yarlott, we therefore hold that the primary purpose underlying the stipend payments at issue was to compensate petitioner Emery for services rendered. Such payments are *494 therefore includable in Emery's gross income. To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. By our Order of June 20, 1983, granting a joint motion of the parties to consolidate, cases of the following petitioners are consolidated herewith: Daniel Dunn and Connie Dunn, docket No. 11793-81; and Robert W. Emery and Ann Emery, docket Nos. 13065-81 and 18372-82.↩
2. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
3. Hille A. Kersten, Connie Dunn and Ann Emery are parties to these proceedings solely by reason of filing such joint *federal income tax returns with, respectively, petitioners Kersten, Dunn and Emery.↩
4. Dr. John Delaney, a professor of surgery at the University of Minnesota, testified that the academic phase of the program was situated between the two clinical phases in order to reduce the financial incentives for a medical fellow to depart the program prior to completion of the academic phase.↩
5. As the medical fellows progress through the program, they assume increased responsibilities in the wards and in the operating room.↩
6. While Emery's transfer actually occurred in September 1976, when he commenced research-oriented activities in the physiology laboratory of De. Irwin J. Fox, a professor of physiology at the University of Minnesota, his transfer was not officially recorded by the University until August 1978.↩
7. The academic phase is not a prerequisite to board certification.↩
8. Publications resulting from such research credit the student's research advisor, who offers suggestions and guidance during the course of such research, with being a coauthor of the paper.↩
9. Petitioners were involved, during the academic phase of the program, in both basic research (i.e., research with no immediate clinical applicability) and applied research (i.e., research with the potential for human clinical applications). At no time during the academic phase of the program were any of the petitioners involved in contract research (i.e., specific research projects undertaken at the request of the grantor funding such research).↩
10. While the parties stipulated that Emery's research involved gastrin cell physiology, testimony at trial both by Emery and by his research advisor, Dr. Irwin J. Fox, indicated that he was actually involved in researching certain "cardio-peripheral or heart to body reflexes," and this testimony was confirmed by petitioners on brief. Under these circumstances, we have rejected the stipulation of the parties on this point (we note that our determination of which of these two types of research petitioner Emery was engaged in, will have no bearing upon our resolution of the issue herein).↩
11. Blank spaces indicate that the amount of the stipend is not disclosed in this record.↩
12. An additional adjustment made by respondent for petitioner Kersten, relating to his receipt of additional interest income in taxable year 1977, was not challenged in his petition, and is not at issue herein.↩
13. Petitioners concede that no funds were received by them from the PHS during any of the years here in issue.↩
14. Sec. 117(b)(1) provides as follows: SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS (b) Limitations.-- (1) Individuals Who Are Candidates For Degress. -- In the case of an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.↩
15. See also Gomes v. Commissioner,T.C. Memo. 1983-292↩.
16. Phillips v. Commissioner,T.C. Memo. 1976-67↩.