KENNETH D. AND PAMELA S. CHRISTMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Christman v. Commissioner
Docket No. 26748-83.
United States Tax Court
T.C. Memo 1989-259; 1989 Tax Ct. Memo LEXIS 259; 57 T.C.M. (CCH) 538; T.C.M. (RIA) 89259; May 30, 1989. *259 Petitioner-husband was a house staff physician with the Baylor College of Medicine graduate program in Houston, Texas, during 1979, and with the Kettering Medical Center residency program in Dayton, Ohio, during 1980. His car was damaged in a flood during 1979. In 1980, petitioners received substantial amounts of long-term capital gains from the sales of securities; also, they paid substantial amounts of interest in connection with these securities. Held: (1) Payments to petitioner-husband are not excludable from income as scholarships or fellowship grants. Sec. 117(a), I.R.C. 1954. (2) Petitioners are not entitled to deduct travel expenses because they have not satisfied the requirements of sec. 274, I.R.C. 1954. (3) Amounts of auto expenses for local transportation are determined. Sec. 162, I.R.C. 1954. (4) Flood damage to petitioner-husband's car is a "casualty" loss, under sec. 165(c)(3), I.R.C. 1954. Amount of loss determined. (5) Amount of petitioners' tax preference for capital gains, for purposes of the alternative minimum tax imposed by sec. 55, I.R.C. 1954, is not reduced by interest payments incurred in the transactions which gave rise to the capital gains; also, the *260 deducted interest expense is included in adjusted itemized deductions as a part of the alternative minimum tax base. Kenneth D. Christman and Pamela S. Christman, pro sese. Brett J. Miller, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioner Kenneth D. Christman (hereinafter sometimes referred to as "Christman") for 1979 in the amount of $ 1,506, and against both petitioners for 1980 in the amount of $ 7,434.39. After concessions by both sides, the issues for decision [1] *261 are as follows: (1) Whether Christman is entitled to exclude amounts he received in 1979, as scholarships or fellowship grants under section 117; [2]
(2) Whether Christman (for 1979) and petitioners (for 1980) are entitled to deduct certain automobile expenses; (3) Whether Christman (for 1979) and petitioners (for 1980) are entitled to deduct claimed travel expenses; (4) Whether Christman is entitled to a casualty loss deduction for 1979 on account of flood damage to his automobile; and (5) Whether respondent properly determined the amount of petitioners' alternative minimum tax for 1980. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners resided in Dayton, Ohio. Christman filed a separate Federal individual income tax return for 1979; petitioners filed jointly for 1980. Stipend -- 1979
The Baylor College of Medicine (hereinafter sometimes referred to as "Baylor College") and its affiliated hospitals maintain a graduate medical training program (hereinafter sometimes referred to as "the *262 Baylor Program") to provide "accredited educational and training experience consistent with the guidelines and standards set forth in the Essentials of Approved Residencies of the [American Medical Association]." Physicians participating in the Baylor Program were licensed to perform surgery, were responsible for preoperative and postoperative diagnosis, and also had teaching responsibilities. Christman, as a plastic surgery house staff physician, participated in the Baylor Program to attain professional competence necessary to be board certified as a plastic surgeon. Christman was regularly required to work for 12 to 24 hours at a time at the hospital emergency room to which he was assigned. Christman's work was supervised and was geared to planned time schedules. In 1979, Christman received $ 1,800 (hereinafter sometimes referred to as "the stipend") from Baylor College, through the Baylor Program. Baylor College withheld Federal income and Social Security taxes on the stipend. The stipend was not based on financial need; rather, the amount of the stipend reflected the number of years of training that the physician had completed since medical school that were creditable toward *263 certification in the specialty in which the physician was training. The Baylor Program provided to Christman (as a house staff physician) the following: group hospitalization insurance, term life insurance, disability insurance, and malpractice insurance, all at no cost. Christman was entitled to 2 or 3 weeks of vacation per year, depending on seniority. Failure of a house staff physician to report to work without acceptable reasons represented a breach of contract, under the Baylor Program policies and procedures, and the house staff physician would be "subject to immediate termination of contract", subject to certain procedural due process rights. The Baylor Program's policy statement provides that "An accused house staff physician shall continue to draw full pay until completion of the appeals process." Christman deducted the $ 1,800 as an itemized miscellaneous deduction on his 1979 tax return. In the notice of deficiency, respondent disallowed the deduction. Travel Expenses -- 1979 and 1980
On his 1979 tax return, Christman claimed a miscellaneous expense deduction of $ 3,223.65 for travel, interviews, and conventions. Respondent allowed $ 1,718.49. On their 1980 tax return, *264 petitioners claimed $ 3,883; respondent allowed $ 2,393.55. Business Auto -- 1979 and 1980
During 1979, Christman resided next to Baylor College, which was next to the primary hospital at which Christman worked. As a house staff physician, Christman was required to work at various hospital emergency rooms in the Houston, Texas, area, to which he was assigned for periods generally extending from 12 to 24 hours. The other hospital emergency rooms were as far as 80 miles from Baylor College. Christman kept records in calendar form of the number of hours he worked at the various hospitals during September and November 1979 (hereinafter sometimes referred to as "the calendar records"). Christman did not keep a log book to show how much of his auto usage was for business purposes and how much for personal purposes. He did not keep a journal, or diary (other than the calendar records) to show the occasions or amounts of his business use of his auto. In 1980, Christman was in a similar program in the Dayton, Ohio, area. His primary hospital was the Kettering Medical Center, and he routinely traveled between hospitals in the Dayton area in the course of this program. During 1979 and 1980, *265 Christman made about 50 trips between hospitals each year; some of these times he drove directly between hospitals, while other times he stopped at home to pick up fresh clothes or his mail. The average distance of the trips in 1979 in Houston was about 25 miles, and in 1980 in Dayton was about 5 miles. On his 1979 tax return, Christman claimed an auto expense (business auto, gas, and repair expenses) deduction of $ 3,872.60. On their 1980 return, petitioners claimed an auto expense deduction of $ 1,555.80. Respondent disallowed the entire amounts for both years. Petitioners did not maintain any records of automobile use or expenses, other than the calendar records (discussed supra) and certain repair records (discussed infra, under "Casualty Loss -- 1979"). Christman traveled at least 1,000 miles during 1979, and at least 200 miles during 1980, between hospitals, apart from traveling between home and work. Casualty Loss -- 1979
In February 1979, Christman bought a 1974 Fiat for $ 1,300. About 6 weeks later, he spent about $ 500 to have the Fiat repaired. About 2 weeks after that (about mid-April), there was a flood at the Texas Medical Center where Christman had parked the car; *266 the water level reached the door handles. The Fiat needed repair work to get it clean and running again. Christman incurred expenses of $ 257.21 attributable to the flood damage. Despite the repairs, the Fiat never ran as well after the flood, and Christman sold the Fiat in late 1979 for about $ 800. He then bought a 1979 Oldsmobile Cutlass for $ 5,300. The flood resulted in a loss to Christman of not less than $ 257.21. Alternative Minimum Tax -- 1980
Petitioners reported on their 1980 tax return three securities sales that resulted in a net short-term loss of $ 381.88; and seven securities sales that resulted in a net long-term gain of $ 91,666.45. After netting these results ($ 91,284.57), petitioners properly excluded 60 percent ($ 54,770.74) from income and included the remaining 40 percent ($ 36,513.83) in arriving at their adjusted gross income ($ 59,204.80). Petitioners claimed on their 1980 tax return an itemized ("below-the-line") deduction of $ 29,407.15 for interest expense. [3] All of this interest expense was incurred in the course of buying, holding, and selling the securities that produced the capital gain. Petitioners also claimed $ 30,738.63 of other itemized *267 deductions. From the total itemized deductions ($ 60,145.78), they subtracted the zero bracket amount ($ 3,400) and deducted the remainder ($ 56,745.78) in arriving at tax table income. OPINION I. Exclusions and Deductions
A. Stipend -- 1979
Respondent maintains that the amounts Christman received from Baylor College while in the Baylor Program represent compensation for services performed and are not properly excludable from income. Petitioners maintain that the amounts received are scholarships or fellowship grants. [4]
We agree with respondent. Section 117(a)(1)[5] *269 provides generally that scholarships and fellowship *268 grants are excludable from gross income. Section 1.117-4(c)(2), Income Tax Regs., provides that amounts paid to "an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity". Section 1.117-4(c)(2), Income Tax Regs., also provides that "Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant." However, the terms "scholarship" and "fellowship grant" do not include any amount which "represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." Sec. 1.117-4(c)(1), Income Tax Regs.
In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court sustained the validity of these regulations stating as follows: [T]he definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no strings" educational grants, with no requirement of any substantial quid pro quo from the recipients. Thus, under these regulations, the distinction between compensation for services, and a scholarship or a fellowship grant, turns on whether the recipient was paid to work or paid to study. Yarlott v. Commissioner,78 T.C. 585, 595 (1982), affd. 717 F.2d 439 (CA8 1983); Zolnay v. Commissioner,49 T.C. 389, 396 (1968). Determination of the primary purpose *270 of such payments in each case must necessarily "turn upon its own particular facts and circumstances". Steiman v. Commissioner,56 T.C. 1350, 1355 (1971); Zolnay v. Commissioner,49 T.C. at 395. Nevertheless, we note that the issue of includability in gross income of amounts paid to a medical intern or resident frequently has been litigated in recent years with the almost invariable outcome of such litigation going against the taxpayer-physician. See Cooney v. United States,630 F.2d 438, 439 (CA6 1980); Yarlott v. Commissioner,78 T.C. at 596, and cases cited therein. Petitioners have the burden of proving that the amounts received were scholarships or fellowship grants. Olick v. Commissioner,73 T.C. 479, 486 (1979); Rule 142(a). [6]
Based on the record as a whole, we conclude that the primary purpose of the amounts paid by Baylor College to Christman was to compensate him for services rendered to Baylor College, rather than to enable Christman to study. Baylor College required a substantial quid pro quo from Christman in return for the amounts it paid him. We conclude that the *271 amounts Christman received did not constitute a scholarship or fellowship grant within the meaning of section 117(a)(1). Our decision rests on the following factors: (1) Christman was regularly required to work long hours, frequently for shifts of 24 hours. That Christman worked long hours with such regularity is an indication that he was paid to work rather than to study ( Zolnay v. Commissioner,49 T.C. at 397-398), at least in the absence of evidence that others without stipends worked similarly long hours. (2) Christman's activities were subject to supervision and were geared to planned time schedules. He was charged with considerable responsibility. Zolnay v. Commissioner,49 T.C. at 397. (3) Baylor College withheld from the stipend Federal income tax and Social Security taxes. Although the fact of withholding standing alone is not determinative under section 117, see Bhalla v. Commissioner,35 T.C. 13, 17-18 (1960), such a practice is indicative of an employer-employee relationship. Zolnay v. Commissioner,49 T.C. at 398. (4) The stipend was not based on financial need, which may indicate a compensatory arrangement. Cf. Steiman v. Commissioner,56 T.C. at 1355. (5) Baylor *272 College provided Christman with fringe benefits normally associated with an employer-employee relationship, such as group hospitalization insurance, term life insurance, disability insurance, and malpractice insurance. We hold for respondent on this issue. B. Travel Expenses -- 1979 and 1980
Petitioners contend that they are entitled to deductions for expenses attributable to travel and lodging related to medical meetings, interviews, and conventions. Respondent contends that petitioners have failed to meet the substantiation requirements of section 274(d) and that, therefore, petitioners are not entitled to any deduction for those expenses. We agree with respondent. Deductions are allowable under section 162[7] *273 for the taxpayer's ordinary and necessary expenses in carrying on a trade or business. However, section 274[8] *274 provides that no deduction is allowable under section 162 for travel expenses, unless the taxpayer substantiates certain matters by adequate records or by sufficient evidence corroborating the taxpayer's own statement. Under section 1.274-5(c)(2)(i), Income Tax Regs., in order to meet the "adequate records" requirement, a taxpayer is to maintain an account book, diary, statement of expenses, or similar record and documentary evidence (such as receipts, paid bills, or similar evidence) which, when combined, establish each element of the expense that section 274(d) requires to be established. If the taxpayer lacks adequate records, then the taxpayer is to provide a written or oral statement by the taxpayer containing sufficient information in detail as to each element set forth in section 274(d), as well as sufficient other corroborative evidence. Sec. 1.274-5(c)(3), Income Tax Regs.
Christman testified that he incurred travel expenditures during 1979 and 1980 in connection with his practice of medicine. However, petitioners have not established, as to any item of travel, the amount, time, place, or business purpose of the travel, all of which are specifically required by section 274(d). The broad-brush description in Christman's testimony [9] does not satisfy the section 274(d) substantiation requirements *275 as to each item of expense for travel. Petitioners did not produce any "adequate records" or other evidence to sufficiently corroborate his testimony. See Andress v. Commissioner,51 T.C. 863, 868-869 (1969), affd. 423 F.2d 679 (CA5 1970). On brief, petitioners state as follows: Petitioners feel they are entitled to the deductions as claimed, of $ 1,505.16 for the year 1979 and $ 1,489.45 for 1980. Petitioners feel that these are conservative estimates for the actual amounts expended, and that this matter should be self-explanatory. The amounts referred to are the amounts that respondent disallowed. As we have found, respondent allowed $ 1,718.49 for 1979 and $ 2,393.55 for 1980, well over half of the amounts that petitioners claimed. Firstly, on the record in the instant case, petitioners have failed to persuade us that they paid or incurred any deductible expenses in excess of the amounts respondent allowed. As a result, we would not allow them to deduct any amount in excess of respondent's allowances *276 even if section 274 had not been enacted. Secondly, section 274 was enacted with the specific intent of stopping the allowance of travel expense deductions based on estimates (whether "conservative", "liberal", or otherwise). Sanford v. Commissioner,50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (CA2 1969). Petitioners have failed to satisfy the statutory requirements and so are not entitled to deduct any amounts of travel expenses in excess of what respondent allowed. We hold for respondent on this issue. C. Business Auto -- 1979 and 1980
Petitioners contend that they are entitled to deduct certain automobile expenses, which petitioners claim are attributable to local transportation. Respondent contends that petitioners have failed to prove that the claimed expenses were not attributable to travel between Christman's home and work. We agree in part with petitioners and in part with respondent. Deductions are allowable under section 162 for the taxpayer's ordinary and necessary business expenses. However, petitioners bear the burden of overcoming the presumption of correctness which attaches to respondent's factual determinations in the notice of deficiency. Welch v. Helvering,290 U.S. 111 (1933); *277 Rule 142(a). The substantiation requirements of section 274 do not apply to deductions for local transportation. Gestrich v. Commissioner,74 T.C. 525, 530-531 (1980), affd. without published opinion 681 F.2d 805 (CA3 1982). Under Cohan v. Commissioner,39 F.2d 540, 544 (CA2 1930), this Court may approximate the amount incurred for local transportation, if we are convinced an amount was actually spent. Based on Christman's testimony and on the calendar records, it appears that some portion of the claimed automobile expenses was for travel from home to work, and from work to home, for personal purposes. Deductions are not allowable for this portion of his automobile expenses. On the other hand, expenses for transportation between business locations are deductible. E.g., Steinhort v. Commissioner,335 F.2d 496, 504-505 (CA5 1964), affg. and remanding a Memorandum Opinion of this Court; [10]Dancer v. Commissioner,73 T.C. 1103 (1980). Petitioners contend that, because petitioners resided close to the primary hospital at which Christman worked, none of the expenses could be attributable to travel to and from work. Based on the record before us, we do not agree. *278 The calendar records, which are almost all petitioners have given us to go on, show that during 1979, Christman normally worked at only one hospital per shift; we do not have any evidence that Christman had to report to the primary hospital before heading to his assigned emergency room shift. However, we are convinced, and we have found, that Christman's work schedule was such that he traveled directly from hospital to hospital on several occasions. We are convinced that Christman did incur some deductible local transportation expenses during 1979 and during 1980. However, petitioners' evidence as to amount is sparse. Christman's testimony and the calendar records have enabled us to estimate the average distances between the hospitals. We have also considered Christman's testimony that sometimes he would stop at home between shifts. "[B]earing heavily * * * upon the taxpayer[s] whose inexactitude is of [their] own making" ( Cohan v. Commissioner,39 F.2d at 544), we conclude, and we have found, that Christman travelled at least 1,000 miles during 1979, and at least 200 miles during 1980, from hospital to hospital, apart from travelling between home and work. Petitioners did not *279 present sufficient evidence of the amount of their actual expenses; accordingly they must rely on the mileage allowances in effect for 1979 and 1980. For 1979, the standard mileage rate was 18.5 cents per mile for the first 15,000 miles of use each year for business purposes. Rev. Proc. 80-7, 1980-1 C.B. 590. For 1980 the standard mileage rate was 20 cents per mile for the first 15,000 miles of use each year for business purposes. Rev. Proc. 82-61, 1982-2 C.B. 849. Christman is entitled to deduct $ 185 for 1979 (1,000 miles times 18.5 cents per mile), and petitioners are entitled to deduct $ 40 for 1980 (200 miles times 20 cents per mile). We hold in part for petitioners on this issue. D. Casualty Loss -- 1979
At trial, Christman claimed a casualty loss deduction for 1979 for flood damage to his Fiat. [11] Christman did not specify the amount of the loss caused by the flood, but introduced repair receipts which he testified were attributable to flood damage. Respondent argues that Christman has not proven (1) a casualty, (2) that the claimed loss was a result of the casualty, (3) the value of the property before and after the casualty, (4) the cost of repairs, and (5) the basis of *280 the property. We agree with Christman that some loss deduction is allowable. Section 165[12] *281 permits individuals to deduct nonbusiness casualty losses to the extent not compensated for by insurance or otherwise. The measure of such a loss has generally been said to be the difference between the fair market value of the property immediately before the casualty and its fair market value immediately thereafter, but not exceeding its adjusted basis. See Helvering v. Owens,305 U.S. 468, 471 (1939); Lamphere v. Commissioner,70 T.C. 391, 395 (1978); sec. 1.165-7(b)(1), Income Tax Regs. We believe, and have found, on the basis of Christman's credible testimony, that there was a flood in mid-April of 1979 and that the water level reached the door handles of Christman's Fiat. We also believe and have found, on the basis of Christman's credible testimony and on the basis of receipts which Christman introduced into evidence, that Christman incurred a loss as a result of the flood. Respondent does not contend that Christman was compensated for the *282 casualty losses by insurance or otherwise. Christman's basis exceeds the amount of the loss. The remaining hurdle between Christman and his claimed casualty losses is whether he has carried his burden of proving that he sustained a loss in excess of the $ 100 "floor" of section 165(c)(3). We conclude that Christman has carried his burden, and that he is entitled to a loss deduction for those expenses attributable to the flood. Christman has not presented us with comparative appraisals of fair market value. However, as an alternative to the fair-market-value-appraisal method of determining the amount of a casualty loss, the Treasury regulations treat the cost of repairs as evidence of the amount of a casualty loss, if certain requirements are met. Sec. 1.165-7(a)(2)(ii), Income Tax Regs.[13] *283 This rule has been held to apply only where the repairs have in fact been made. Lamphere v. Commissioner,70 T.C. at 396; Farber v. Commissioner,57 T.C. 714, 719 (1972). In the instant case, some repairs have been made. Respondent, however, asserts that the repairs were not necessary to restore the Fiat to its precasualty condition, and that the first stated condition of the regulation has therefore been violated. Respondent's analysis of the situation seems bottomed on a determination to ignore Christman's testimony. Christman credibly testified that there was a flood and that the water level reached the door handles of Christman's Fiat. It strains belief to deny that such a submersion would not cause damage to the car. To establish the amount of the casualty loss under the cost-of-repair method, petitioners introduced various receipts for repairs to the Fiat, as set forth in table 1. Place of Service
Date
Amount
1. Aydam's Exxon
3/30/79
$ 267.03
2. Aydam's Exxon
4/ 4/79
230.15
3. Med. Center Shell
4/23/79
187.21
4. Auto Clinic
5/ 1/79
70.00
5. Bill's Auto Air
8/17/79
59.69
6. World of Imports
(Used Auto Parts)
8/22/79
10.07
7. Auto Sports Ltd.
9/27/79
63.72
8. Bray Auto Parts, Inc.
11/6/79
10.22
The *284 first two items on table 1 appear to be for repairs that Christman testified were made in order to put the Fiat into satisfactory operating condition after he bought it, and before the flood. The next two items ($ 187.21 and $ 70) were for repairs soon after the flood and are for items that would be appropriate to clean, check, and repair a car after a flood. The last four items are relatively far removed from the time of the flood and appear to be largely normal maintenance items. Accordingly, we have found that Christman suffered a casualty loss of $ 257.21 in 1979. Christman is entitled to deduct the amount by which this loss exceeds the $ 100 floor applicable to 1979. We hold in part for petitioners on this issue. II. Alternative Minimum Tax -- 1980
Section 55[14] *286 imposes a minimum tax on a tax base which includes "adjusted itemized deductions" and "capital gains". Section 57(b)(1)[15] *287 *288 includes "itemized deductions" (except certain itemized deductions (State and local taxes, medical expenses, and others)), in the category of adjusted itemized deductions. Section 63(f)[16] excludes so-called "above-the-line" deductions from the category of itemized deductions. Section 62(3)[17] *289 *285 provides that the long-term capital gains deduction is an above-the-line deduction. Section 57(a)(9) provides that the capital gains tax preference is the deduction determined under section 1202, which for 1980 was 60 percent of net capital gains. Sec. 1202(a). Petitioners argue that interest expenses generated from the buying, holding, and selling of stock are deductible in arriving at alternative minimum taxable income. Otherwise, petitioners argue, a taxpayer could owe taxes on a transaction which really produced a loss, and then "we should refer to an Income and Loss Tax, rather than an Income Tax." Petitioners argue that it was not the intent of Congress to deny a deduction for interest expense in computing the alternative minimum tax. Respondent concedes the correctness of petitioners' claimed interest expense deduction in computing their section 1 tax (see n.3, supra), but contends that interest incurred with respect to an investment in nonbusiness property is deductible only as an itemized deduction on Schedule A (Form 1040). We agree with respondent. Almost precisely the same issue was presented in McCarthy Trust v. Commissioner,86 T.C. 781 (1986), affd. 817 F.2d 558 (CA9 1987), and Wallach v. United States,800 F.2d 1121 (CAFC 1986). [18] In both McCarthy Trust and Wallach, the taxpayers contended for the right to offset interest expense deductions against reported interest income (or dividend income) to which the expense *290 related, thereby avoiding the inclusion of the deducted interest expense in the minimum tax base. This Court (in McCarthy Trust) and the Courts of Appeals held that the statute does not provide for the taxpayers' claimed right to offset the expense directly against the income, and included the interest expense in the minimum tax base. The same analysis applies where the income takes the form of capital gains. Petitioners' capital gains are not directly reduced by the interest expenses. Petitioners receive the full benefit (for section 1 income tax purposes) of the 60-percent deduction under section 1202(a); that benefit is not reduced by the interest expenses. As a result, the capital gains tax preference is includible in the minimum tax base. Petitioners argue that this analysis might result in imposing the alternative minimum tax on transactions which result in losses. We note that petitioners reported an economic profit of $ 91,284.57 from their 1980 securities sales. Their reported $ 29,407.15 of related interest expense left them with $ 61,877.42 of economic profit. *291 We expect that the Rule 155 computation will show that petitioners' 1980 total Federal income tax liability will amount to only 10 percent, or less, of their 1980 securities sales economic profit. We leave to another day the question of whether the 1980 version of the alternative minimum tax provisions could produce a tax on an economic loss and, if so, how that should be dealt with; these provisions have not taxed an economic loss in the instant case. We hold for respondent on this issue. To reflect the foregoing and concessions, Decision will be entered under Rule 155.
Footnotes
1. Christman claimed a deduction for 1979 for work-related legal expenses in the amount of $ 5,079.34. Respondent allowed $ 4,801 in his notice of deficiency, and then conceded an additional $ 139.17, for a total of $ 4,940.17. On opening brief, respondent states that the legal expenses issue is still before the Court; however, neither party addressed the issue on brief nor at trial. We deem Christman to have conceded the remaining $ 139.17. ↩
2. Unless indicated otherwise, all section, part, chapter, and subtitle references are to sections, parts, chapters, and subtitles of the Internal Revenue Code of 1954, as in effect for the years in issue.↩
3. Respondent increased this by $ 113.67, for a total interest expense itemized deduction of $ 29,520.82.↩
4. Although Christman deducted the $ 1,800 and the notice of deficiency disallowed the deduction, the parties recognize that the issue is whether the stipend is excludable, not whether it is deductible. We assume that Christman included the stipend in the income he reported on his 1979 tax return (since respondent does not suggest the contrary) and that disallowance of Christman's deduction is merely the mechanical method which respondent chose to arrive at the proper result.↩
5. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. -- In the case of an individual, gross income does not include -- (1) any amount received -- (A) as a scholarship at an educational organization described in section 170(b)(1)(A)(ii), or (B) as a fellowship grant, including the value of contributed services and accommodations; * * * [The subsequent revision of sec. 117↩ by sec. 123(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2112-2113, does not affect the instant cases.]
6. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
7. Sec. 162(a)(2) provides, in relevant part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- * * * (2) travelling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business * * * ↩
8. Sec. 274 provides, in relevant part, as follows: SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC. EXPENSES. * * * (d) Substantiation Required. -- No deduction shall be allowed -- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel * * *, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * * [The subsequent amendments of this provision by sec. 179(b)(1) of the Deficit Reduction Act of 1984 (Pub. L. 98-369, 98 Stat. 494, 718), and the undoing of much of these amendments by secs. 1 and 6 of Pub. L. 99-44 (99 Stat. 77, 78), do not affect the instant case.]
9. E.g., "these figures for both 1979 and 1980 * * * simply represented a per diem allowance of $ 50 per day for lodging, meals, taxi fares, tips, and phone calls away from home."↩
10. T.C. Memo. 1962-233↩.
11. The casualty loss claimed was originally subsumed in the business automobile expense deduction Christman claimed for 1979.↩
12. Sec. 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $ 100. * * * [The subsequent amendments of this provision by sec. 203(b) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 422) and by sec. 711(c)(2)(A)(i) of the Tax Reform Act of 1984 (Pub. L. 98-369, 98 Stat. 494, 943) do not apply to the instant case.]↩
13. Sec. 1.165-7. Casualty losses. (a) In general -- * * * (2) Method of valuation. * * * (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.
14. Sec. 55 provides, in pertinent part, as follows: SEC. 55. ALTERNATIVE MINIMUM TAX FOR TAXPAYERS OTHER THAN CORPORATIONS. (a) Alternative Minimum Tax Imposed. -- In the case of a taxpayer other than a corporation, if -- (1) an amount equal to the sum of -- (A) 10 percent of so much of the alternative minimum taxable income as exceeds $ 20,000 but does not exceed $ 60,000, plus (B) 20 percent of so much of the alternative minimum taxable income as exceeds $ 60,000 but does not exceed $ 100,000, plus (C) 25 percent of so much of the alternative minimum taxable income as exceeds $ 100,000, exceeds (2) the regular tax for the taxable year, then there is imposed (in addition to all other taxes imposed by this title [the Internal Revenue Code]) a tax equal to the amount of such excess. (b) Definitions. -- For purposes of this section -- (1) Alternative minimum taxable income. -- The term "alternative minimum taxable income" means gross income -- (A) reduced by the sum of the deductions allowed for the taxable year, * * * (C) increased by an amount equal to the sum of the tax preference items for -- (i) adjusted itemized deductions (within the meaning of section 57(a)(1), and (ii) capital gains (within the meaning of section 57(a)(9). For purposes of subparagraph (A) (and in determining the sum of itemized deductions for purposes of subparagraph (C)(i)), a deduction shall not be taken into account to the extent such deduction may be carried to another taxable year. (2) Regular tax. -- The term "regular tax" means the taxes imposed by this chapter [chapter 1 (normal taxes and surtaxes)] for the taxable year (computed without regard to this section * * *). [The subsequent retroactive amendment of this provision by sec. 305(c) of the Technical Corrections Act of 1982 (Pub. L. 97-448, 96 Stat. 2365, 2399) is reflected in the above text. The subsequent revisions of this provision by sec. 201(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 411), and by sec. 701(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2320) do not apply to the instant case.] ↩
15. Sec. 57provides, in pertinent part, as follows: SEC. 57. ITEMS OF TAX PREFERENCE. (a) In General. -- For purposes of this part [part VI (relating to alternative minimum tax)], the items of tax preference are -- (1) Adjusted itemized deductions. -- In the case of an individual, an amount equal to the adjusted itemized deductions for the taxable year (as determined under subsection (b)). * * * (9) Capital Gains. -- (A) Individuals. -- In the case of a taxpayer other than a corporation, an amount equal to the net capital gain deduction for the taxable year determined under section 1202. * * * (b) Adjusted Itemized Deductions. -- (1) In general. -- For purposes of paragraph (1) of subsection (a), the amount of the adjusted itemized deductions for any taxable year is the amount by which the sum of the itemized deductions (as defined in section 63(f) other than -- * * * exceeds 60 percent of the taxpayer's adjusted gross income reduced by the items in subparagraphs (A) through (D) for the taxable year. * * * [The subsequent amendments of this provision by sec. 121(c)(1) of the Economic Recovery Act of 1981 (Pub. L. 97-34, 95 Stat. 172, 197), and the repeal of the adjusted itemized deductions tax preference by secs. 201(b)(1)(A) and 204(b) of the Tax Equity Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 416, 426) do not apply to the instant case.] 16. SEC. 63. TAXABLE INCOME DEFINED. * * * (f) Itemized Deductions. -- For purposes of this subtitle [subtitle A (relating to income taxes)], the term "itemized deductions" means the deductions allowable by this chapter [chapter 1] other than -- (1) the deductions allowable in arriving at adjusted gross income, and (2) the deductions for personal exemptions provided by section 151. * * * [The subsequent amendment of this provision by sec. 102(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2099, does not affect the instant case. Sec. 63(f) now appears as sec. 63(d)↩.] 17. SEC. 62. ADJUSTED GROSS INCOME DEFINED. For purposes of this subtitle, [subtitle A] the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions: * * * (3) Long-term capital gains. -- The deduction allowed by section 1202. [The subsequent deletion of this provision by sec. 301(b)(1) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2217) does not apply to the instant case.]
18. See Zambakian v. Commissioner,T.C. Memo. 1986-219, affd. without published opinion 815 F.2d 697↩ (CA3 1987).